1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| COMPASS BANK, an Alabama banking corporation, d/b/a "BBVA COMPASS", | Case No. 13-cv-654 BAS (WVG)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND RESULTING JUDGMENT** |
| Plaintiff, | |
| v. | |
| MORRIS CERULLO WORLD EVANGELISM, a California corporation, | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

20   On March 19, 2013, Plaintiff Compass Bank ("BBVA") brought a declaratory

21  relief action against Defendant Morris Cerullo World Evangelism ("MCWE") to

22  declare that a $5.2 million standby letter of credit purportedly issued by BBVA and

23  held by MCWE was not enforceable. ECF 1.

24   On May 17, 2013, MCWE answered and countersued BBVA and third-party

25  defendants Larry Sorenson, Christopher Hammatt, and Jack Wilkinson. ECF 6. On

26  June 28, 2013, MCWE amended its counterclaim.[1] ECF 12. On November 12, 2013,

27
28

---

[1] MCWE incorrectly refers to the counterclaims as crossclaims in its pleadings.

1    Sorenson answered and countersued. ECF 35.

2         Jack Wilkinson, Christopher Hammatt, and Arrowmark defaulted (ECFs 44–

3    47, 69, 70), and MCWE filed motions to default against Arrowmark, LLC and Jack

4    Wilkinson (ECFs 82, 83).

5         MCWE's Second Amended Counter-Claim ("SACC"), filed on October 18,

6    2013, is its operative pleading. ECF 31. MCWE asserts breach of contract and

7    promissory estoppel claims against BBVA. MCWE asserts breach of contract,

8    promissory estoppel, conversion, and two counts of fraud against Arrowmark and

9    Hammatt. MCWE asserts promissory estoppel, conversion, and two counts of fraud

10   against Sorenson. Lastly, MCWE asserts conversion and one count of fraud against

11   Wilkinson.

12        On March 20, 2015, BBVA and MCWE filed cross-motions for summary

13   judgment. ECFs 117, 120. The Court orally denied the motions on May 28, 2015

14   and set the action for a bench trial beginning August 11, 2015.

15        The Court held a bench trial from August 11, 2015 to August 14, 2015. The

16   parties filed their closing arguments by brief on August 21, 2015. After reviewing

17   the facts of the case as presented at trial, the admitted exhibits, equity, and applicable

18   law, the Court **GRANTS** BBVA's requested declaratory relief.

**I.    JURISDICTION**

20        BBVA brought this action in diversity under 28 U.S.C. § 1332 and the federal

21   Declaratory Judgment Act (28 U.S.C. § 2201(a)). MCWE invokes the Court's

22   supplemental jurisdiction under 28 U.S.C. § 1367(a) over its counterclaims.

23        Under 28 U.S.C. § 1367(b), if federal subject matter jurisdiction arises solely

24   from diversity, a court cannot exercise supplemental jurisdiction if doing so would

25   destroy diversity. In some cases, the entire action must be dismissed if the non-

26   diverse joined party is necessary to the litigation under Federal Rule of Civil

27   Procedure 19.

28

In the case of counterclaims, courts ask whether a non-diverse third-party defendant should be treated as a plaintiff for purposes of the diversity determination, and then apply Rule 19(b) to determine whether the case may proceed without joining that party. After this analysis, the court may realign a third-party defendant as an indispensable plaintiff and dismiss the action if it lacks diversity. *B. L. Schrader, Inc. v. Anderson Lumber Co.*, 257 F. Supp. 794 (D. Md. 1966) (finding non-diverse agent was third-party defendant, not indispensable plaintiff); *Butcher v. Hildreth*, 992 F. Supp. 1420 (D. Utah 1998) (realigning non-diverse third-party defendant as indispensable plaintiff in spite of plaintiff's potential claims against third-party).

MCWE is for diversity purposes a citizen of California. So too are Hammatt and Wilkinson, third-party defendants. This Court determined that although Hammatt and Wilkinson are third-party defendants, their position is adverse to both MCWE and BBVA. As such, the Court will not realign them as plaintiffs.

MCWE waived its right to a jury trial because it failed to timely exercise it. *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 942 (9th Cir. 2009); May 28, 2015 Hr'ng, ECFs 179–80. As a result, this Court held a bench trial from August 11, 2015 until August 14, 2015.

The Court **TERMINATES** BBVA's motions for sanctions and contempt against Roger Artz as moot. ECF 279. Artz testified at trial in response to the subpoena this motion was intended to enforce. The Court also **TERMINATES** as moot BBVA's motion to file documents under seal. ECF 274.

## II.   FACTUAL FINDINGS[2]

Morris Cerullo World Evangelism, Inc. ("MCWE") is a 501(c)3 non-profit corporation, headed by Morris Cerullo and incorporated in 1959. Lynn Hodge is MCWE's CEO. He has an accounting degree and has worked as an accountant,

---

[2] These are the Court's findings of fact at trial. Any quotations from documents include the original grammatical errors and misspellings present in the admitted exhibits.

systems analyst, and computer programmer for various entities including the Federal Reserve, Commerce Bank, and Bear Stearns brokerage. He has worked at MCWE since the early 1990s.

Roger Artz is MCWE's Senior Vice President of Development and has been employed by MCWE for over forty years. While MCWE's primary business is a ministry, the stewardship and development divisions of MCWE engage in business deals, including life insurance trusts, real estate, and occasionally loans. Artz's efforts are currently focused on developing an MCWE compound in Mission Valley entitled "Legacy Center." Additionally, he is a trustee of Plaza del Sol, a real estate trust subsidiary of MCWE.

In 2012, Christopher Hammatt was a practicing California attorney living in Murrieta. Andy Castro, who facilitated some of MCWE's life insurance trusts and used Hammatt as an attorney in some of those dealings, introduced him to Artz sometime around 2010. Lisa Mora was employed in Hammatt's office as his paralegal.

Larry Sorenson owns gold-mining property in Utah. He is the sole owner of Arrowmark, LLC and Laramark Investments, LLC. His mining operations are primarily undertaken through Arrowmark, a subsidiary of Laramark. Hammatt represented Arrowmark and Sorenson during this transaction.

Jack Wilkinson was a branch retail manager and vice president at BBVA's Temecula branch. BBVA is a Spanish bank that, after purchasing Compass Bank, has generally done business in the United States as "BBVA Compass Bank." In 2012, BBVA's outstanding standby letters of credit totaled over $1 billion. Geraldine Gurley headed BBVA's International Trade Services ("ITS") department, and her department has sole authority to issue standby letters of credit. ITS's office is in Houston, Texas.

Brenton Gee is a U.S. Secret Service Agent who began investigating Hammatt for malfeasance related to U.S. Treasury Bonds, beginning in 2010.

In July 2012, attorney Christopher Hammatt approached Artz with a "confidential offering" dated July 15, 2012. The offering, purportedly on behalf of Larry Sorenson, Arrowmark, LLC, and Laramark Investments, LLC, amounted to a request for a $3.5 million loan to purchase gold-mining property in Utah. Hammatt and the offering represented that Sorenson had discovered a "rich stream of gold" on property adjacent to his Utah operation. Hammatt, as Sorenson's attorney, was helping Sorenson raise $3.5 million to purchase the property. The offering stated that the deal must be kept confidential and funded quickly, because "when fall arrives, so will the rain and then the snow. The mine will not be able to be pursued until next summer and this causes a potential problem for Arrowmark as the discovery may have to be disclosed[.]"

In exchange for the $3.5 million loan, Arrowmark would pay a lump sum of $4.55 million after 145 days. This represented an APR of 110%. This "incredibly generous" return was "based upon the need and timing of the investment." The offering went on to state that Arrowmark was "very familiar with the 'status' and organizational make-up of MCWE, thus the repayment would be structured in such a way as to not represent an actual 'loan' to Arrowmark from MCWE which could cause serious issues to MCWE and its current tax status."

As collateral, the offer promised a 2% stake in the mining operation, which according to the offering was valued at $122.90 million, and a jade statue purportedly worth $34 million. The offering stated that Arrowmark's yearly gross revenue from its current operations was $8.33 million and netted 52% of the gross.

In addition to the confidential offering, Hammatt provided a brochure detailing Arrowmark's operations. Hammatt also provided an appraisal for a jade statue from the "Jade Gallery," which was for a nine-piece puzzle plaque of Emperor Qin Shi Huangdi from the Chi Dynasty (475–221 B.C.). The appraisal included a "certificate of authenticity/chain of title—ownership/identity of royalty that can verify origin" which stated the statue had been transferred in March 2003 from the

Baroness Monika Elizabeth Freifrau von Quernheim to British citizen Paul Haworth Cater, and from Paul Haworth Cater to Larry Sorenson in 2005. The appraisal "updated" an insurance appraisal performed in 2002 in Colorado. The appraisal also included the "photograph of the Prince who can verify [the statue] was in the Museum of Malaysia." It did not include any contact information for "the Prince." Hammatt stated that he had buyers willing to purchase the jade within sixty days, including Scottish royalty and a Chinese government representative.

The offering closes with Hammatt's attestation: "I look forward to working with you on this investment opportunity. I am personally involved with the principles in this transaction and if I had the resources, I would make the investment."

As of July 2012, Artz had only known Hammatt a short time. Artz and Hodge testified that MCWE had used him exclusively as an attorney for some of the life insurance policies MCWE purchased for its trust. Even so, after reviewing the offering, Artz presented it to Cerullo.

Cerullo initially expressed hesitation about the deal. In response, Hammatt agreed to personally guarantee the loan through a standby letter of credit. On August 1, 2012, Hammatt emailed Artz "deal points" and a scanned copy of a purported Century Bancorp letter of credit for €10 million, with Hammatt as the beneficiary and addressed to BBVA. The letter stated that Century Bancorp, a New Zealand bank, would pay €10 million to the beneficiary upon documentation, signed by the beneficiary, stating that "the applicant has failed to honor in whole its obligations to the beneficiary with respect to the underlying relationship and that the amount of beneficiary's demand under this letter of credit is not greater than the credit amount due and payable to the beneficiary by the account party pursuant to those obligations." Hammatt represented this as additional collateral to the $34 million "Jade Artifact" and "2% in Arrowmark Mining Operations." No one at MCWE questioned why Hammatt did not have the resources to make this investment if he

was, in fact, the beneficiary of a €10 million letter of credit.

In September 2012, Artz and Cerullo brought Hodge into the deal. Artz, Cerullo, and Hodge met on September 6, 2012 to discuss the "personal loan" to Arrowmark, and Hodge expressed concern. The offering itself set an external deadline of September 6 to secure the land rights, and because of his numerous concerns, Hodge felt they could not fully vet the loan before it expired. He questioned the jade's appraisal, and he had numerous questions about the Century Bancorp letter of credit included in the deal. Specifically, the letter was unsigned and the issuing bank was ambiguous. He was also generally unclear on the legal processes necessary to draw on a letter of credit, and MCWE had very limited prior experience with letters of credit.

Lastly, he questioned Sorenson's motivations. "With so much collateral," it seemed imprudent to go to a private lender instead of a commercial bank. Moreover, Sorenson proposed an excessive interest rate that was clearly more expensive than a commercial lending rate. Hodge also found the form of the interest in Arrowmark to be vague, as well as the method of transfer in the event of a default.

As a result, the deal was not consummated before the September 6 "deadline." Even so, Hammatt continued to press for this loan. In response to Hodge, Hammatt reiterated that Arrowmark sought private lenders to avoid disclosing the gold vein before it had the opportunity to purchase the property. It was because of this confidentiality that Arrowmark was willing to pay a high interest rate. He clarified that the 2% interest would be 2% of Arrowmark's monthly revenue until the loan was repaid. He also stated that the true deadline was September 16, 2012, but that if MCWE was "committed to the process," he could formally extend it to secure an additional 20 day extension.

Ultimately, MCWE informed Hammatt that MCWE was not interested in pursuing the deal. Hodge testified that (1) MCWE did not have confidence in the jade appraisal documents, (2) MCWE was not interested in part-ownership in a

mining operation, and (3) MCWE did not want a letter of credit from a foreign bank. Artz confirmed that MCWE determined the Century Bancorp letter of credit to be "unacceptable and untrustworthy." MCWE told Hammatt they might reconsider if Hammatt could provide a letter of credit from a U.S. bank.

On September 24, 2012, Hammatt sent a letter to Cerullo protesting the decision not to go forward with the deal. In this letter, Hammatt said Artz had told him to finalize the transaction, and he had "incurred expenses with the transaction" and "paid fees based upon the understanding and representations that this would be completed." Hammatt told Cerullo he had "literally committed personal family funds for this transaction[,]" and that failure to complete it would be a financial disaster for him. Finally, Hammatt made reference to past dealings with Cerullo, writing "[a]s I have done with you on your personal issues, I have made myself available when you need me...." Hammatt indicated he could provide a standby letter of credit from a U.S. bank, as requested, for an amount exceeding the total repayment.

The next day Hammatt personally delivered a different letter of credit for $5.2 million from BBVA Compass Bank to Artz at the MCWE offices. BBVA is a Spanish bank with U.S. offices, including one in Temecula, California. The letter of credit was signed by Wilkinson. Hammatt was listed as the applicant. The BBVA letter of credit directed that, in order to collect the $5.2 million, the beneficiary must present the letter of credit to the BBVA office on Kirby Drive in Houston, Texas "accompanied by a signed and dated statement worded as follows with the instructions in brackets therein complied with." No instructions in brackets followed and the Kirby Drive address in Houston proved to be an old address no longer used by BBVA.

On either September 26 or 27, 2012, Hodge called Wilkinson to discuss the BBVA letter of credit. Although Hodge called to confirm facts about the BBVA letter of credit, Wilkinson appeared to only know of the Century Bancorp letter of

1  credit. Wilkinson stated that MCWE "would be working with Century Bancorp,"
2  and that BBVA was "advising the transaction." Wilkinson also informed Hodge that
3  he was on vacation at the time.

4       On Saturday, September 29, 2012, Hodge and Artz met Hammatt at his office
5  and drove together to the BBVA branch in Temecula to meet with Wilkinson.
6  Wilkinson managed the Temecula branch and held the title of "vice president."

7       Hodge brought the Century Bancorp and BBVA letters of credit to the
8  meeting, showing them to Wilkinson. Wilkinson told Hodge and Artz that the BBVA
9  letter of credit was valid, that it was issued by BBVA, and was signed by him. In
10 answer to Hodge's question, he said that if Sorenson and Arrowmark defaulted on
11 the loan, MCWE could present the letter of credit to him in Temecula, and he would
12 make sure it was paid out.

13      During the meeting, Hammatt told Hodge and Artz that he had sufficient funds
14 in a BBVA trust account to guarantee payment in the event of default. Wilkinson did
15 not confirm or deny this statement. Neither Hodge nor Artz questioned why
16 Hammatt needed MCWE to provide the $3.5 million even though he allegedly had
17 at least $5.2 million in a BBVA trust account available for this transaction.

18      After the meeting with Wilkinson, Hodge and Artz spoke to Cerullo and
19 decided to agree to the loan. They did no further investigation into Hammatt,
20 Sorenson, or Arrowmark. They did not research bankruptcies, criminal convictions,
21 credit reports, disciplinary proceedings, or other lawsuits filed against these
22 individuals for fraud or dishonesty. They did no analysis of Sorenson or
23 Arrowmark's ability to repay the loan, nor did they attempt to communicate with
24 Sorenson or Arrowmark directly.

25      Over the weekend of September 29, 2012, MCWE and Hammatt finalized the
26 loan documents, and Hammatt delivered the jade statue to MCWE. Hodge directed
27 Hammatt to change the agreement from a "loan" to a "repurchase agreement"
28 because he believed the interest rate on the loan exceeded the legal limit. Under the

repurchase agreement, MCWE would pay Sorenson $3.5 million for the jade, and Sorenson would agree to repurchase it 120 days later. Hammatt unilaterally increased the lump sum payment from $4.55 million to $5.121 million because MCWE was did not want an interest in Arrowmark.

Per the repurchase agreement, Hammatt guaranteed the transaction, backed by a BBVA letter of credit for $5.2 million and the jade statue. No one at MCWE expressed concern that finalizing the deal in the fall, which Hammatt and the offering previously indicated would at best postpone the mining operations and its financial return until the next spring, nor were they concerned that the deal would close far past the date the mining concessions would expire. In fact, MCWE was uninterested in the mining operations—the ostensible purpose of the loan. No one at MCWE spoke to Sorenson before closing the loan, and Sorenson never saw the BBVA letter of credit.

After finalizing the repurchase agreement, all parties (Artz on behalf of Plaza del Sol, Sorenson on behalf of Arrowmark, and Hammatt) signed the agreement. Sorenson's signature was notarized, and he admits signing the document. The final agreement provided that if Hammatt sold the jade statue within 120 days, he would pay MCWE the $5.2 million it was owed, and then Hammatt and MCWE would evenly divide the remaining profits.

On October 1, 2012, MCWE wired $3.5 million to Hammatt's Union Bank trust account through a d.b.a. It was the largest loan MCWE had ever made.

Right after the funds were transferred, Hodge emailed Artz: "Please talk to Chris [Hammatt] about the tithe to the ministry on his commission and on-going donations from Arrowmark and Sorenson for the Legacy Center." Hodge testified that he understood Hammatt received commission for brokering the loan and a percentage of Arrowmark. Hodge believed this deal might "set [Hammatt] for life." After the loan funded, Hammatt paid MCWE $181,000.

Two days later, Artz spoke with Lisa Mora, a paralegal in Hammatt's office,

in seven separate phone calls. Mora told Artz "everything she knew." The Court found her entire testimony credible, and her brief sexual relationship with the married Hammatt while he represented her in divorce proceedings did not change that determination.

Mora told Artz:

a)  Hammatt was not using other money MCWE had given him to pay the life insurance premiums MCWE entrusted him to pay.

b)  Artz should immediately stop the $3.5 million wire transfer because the entire loan was a fraud.

c)  Mora had seen Hammatt and Wilkinson preparing the letter of credit in Hammatt's offices.

d)  The jade appraisal was a fake. Hammatt had forged it.

e)  Hammatt had stolen some treasury bonds from a decedent's estate. He reported them missing and had them reissued in his name and without his client's knowledge.

f)  Mora had researched the Century Bank letter of credit, and it wasn't valid. The BBVA letter of credit was similarly invalid.

g)  Hammatt had recently filed for bankruptcy. Mora sent Artz a court computer confirmation of this bankruptcy filing. Therefore it was highly unlikely his BBVA account contained $5.2 million, as represented in the letter of credit.

h)  Mora had confronted Hammatt about his illegal activities. He had fired her and locked her out of the office.

Artz did not follow up on Mora's communications, putting them down as rants of an "hysterical" female, and Artz told no one else at MCWE, including Hodge or Cerullo, about Mora's allegations. However, Artz did email Hammatt, and he also emailed Sorenson, representing the first direct contact between MCWE and its lendee. Artz relayed some of Mora's allegations, and at Hammatt's behest Sorenson

reassured him that the mining operation was proceeding as planned. At the time of Mora's phone calls, $3 million remained in Hammatt's trust account.

In addition to Mora's warning, Andy Castro, a life insurance salesman who had dealt with MCWE in the past and who had introduced Hammatt to MCWE, called Artz a day or two after the loan funded and asked to meet him for coffee. During that meeting, Castro told Artz he had learned that MCWE had provided some money to Hammatt. Castro told Artz he didn't believe the transaction was real and that Artz should cancel the transaction. Artz told him it was too late. Again, Artz told no one else at MCWE about this warning. Castro's impression was that his warning did not concern Artz. Castro didn't think Artz actually "believed" in the BBVA letter of credit, he just knew he had a letter of credit that came from a bank.

A couple of weeks after the warnings from Mora and Castro, Artz contacted Sorenson by phone for the first time. Artz called to verify Sorenson's receipt of the loan funds. Sorenson told Artz he had only received $500,000. Artz did not seem concerned about this. This was the one and only time Sorenson talked to anyone at MCWE before litigation commenced.

On November 21, 2012, Hodge and Hammatt exchanged emails. Hodge asked about the status of the gold mining. Hammatt reassured Hodge that the mining was on schedule, and MCWE would be paid on time if not sooner because he claimed he was close to selling the jade statue.

In December 2012, Secret Service Agent Brenton Gee was investigating Hammatt for fraud related to U.S. Treasury bonds. Agent Gee received the Century Bancorp letter of credit from a related state investigation. He then contacted BBVA and relayed the identification number and Christopher Hammatt's name, which were the only identifying details on the Century Bancorp letter of credit. BBVA confirmed that the letter of credit was fraudulent. Agent Gee made no mention of either Wilkinson or MCWE's involvement in the letter of credit because the letter was unsigned and did not include any reference to either Wilkinson or MCWE.

On January 15, 2013, Agent Gee discovered that MCWE had wired a large amount of money into Hammatt's account, and so he contacted Artz at MCWE. Agent Gee told Artz he was investigating Hammatt for a fraud scheme and that Hammatt may have defrauded the church. He said Artz was not surprised, but instead was in denial. Artz told him his claim was baseless, this was a "witch hunt" and, despite Agent Gee's assurances that "we don't chase rumors," refused to cooperate with Agent Gee.

However, Artz showed Agent Gee the BBVA letter of credit and the jade statue, both of which Agent Gee assumed were fake. Agent Gee was particularly surprised to see that the BBVA letter of credit represented Hammatt creditworthy for $5.2 million. He did not believe this to be true and told Artz. Artz did not believe Agent Gee's warning. Artz refused to copy the letter of credit for Agent Gee, but Agent Gee managed to copy down its identification number.

After the meeting, Agent Gee contacted BBVA to determine the validity of the letter. He spoke to BBVA employee Bonnie Karow, who told him that the BBVA letter of credit department could confirm its authenticity. He told Karow the letter appeared to be signed by Jack Wilkinson, and Karow said she believed Wilkinson was actually employed by BBVA.

On January 15 or 16, 2013, Karow called Wilkinson to inquire about the BBVA letter of credit. Wilkinson denied any knowledge of the letter and denied signing it. Because BBVA had not yet seen the letter of credit, and did not yet know if anyone had relied on it or who its alleged beneficiary was, this ended BBVA's inquiry at the time.

On February 2, 2013, repayment was due on the agreement, and MCWE had not heard from Hammatt, Sorenson, or Arrowmark. So, on February 4, 2013, Hodge sent demand letters to Hammatt and Sorenson; Wilkinson was cc'd. If Hodge did not receive a response, he planned to meet with Wilkinson to collect on the BBVA letter of credit. When he received no response from Hammatt or Sorenson, Hodge

1    tried to contact Wilkinson. Wilkinson failed to return his calls.

2         Hodge and Cerullo, determined to cash the BBVA letter of credit, drove to

3    Temecula to meet with Wilkinson face-to-face. When they arrived, they were told

4    Wilkinson was out of the office; they waited for him to return.

5         When Wilkinson returned, he met them at the front of the bank and appeared

6    harried and nervous, claiming to be in a rush to get to another meeting. Cerullo

7    insisted that Wilkinson sit down and meet with them. Wilkinson did so and again

8    verified the validity of the BBVA letter of credit. He told them he would immediately

9    begin "processing" it. They left it in Wilkinson's possession.

10        This meeting did not reassure Hodge and Cerullo that Wilkinson would

11   actually process the payment as he claimed, so they contacted BBVA's international

12   letter of credit department ("ITS") directly though a number they found online.

13   Hodge spoke to Geraldine Gurley, head of ITS, at her Houston office. She informed

14   him that, based on the identification number he provided, the letter of credit was

15   fraudulent.

16        After this, Gurley called Wilkinson regarding the BBVA letter of credit.

17   Gurley told Wilkinson he had no authority to issue the letter of credit, and Wilkinson

18   responded, "Well, I issued it. It's done."

19        Hodge spoke to Gurley three or four times over the next two weeks. Hodge

20   offered to fly to Houston to present the BBVA letter of credit in person, but she told

21   him it would not change BBVA's position that it would not be honored. She

22   informed him that Wilkinson had no authority to issue any letters of credit. Gurley

23   later testified that while he did not have this authority, branch managers do have the

24   authority to verify a BBVA letter of credit's validity.

25        Agent Gee continued his investigation, discovering that part of the $3.5

26   million MCWE wired to Hammatt was used to purchase land in Utah. Hammatt also

27   used the money to pay off victims of his Treasury bond scheme and to purchase

28   personal luxury vehicles. Agent Gee's analysis of Hammatt's Union Bank account

1    showed that in total, Hammatt transferred $998,000 to Sorenson (individually and

2    through his wholly-owned Laramark Investments, LLC and Arrowmark, LLC) from

3    MCWE's loaned funds. Agent Gee also determined that Hammatt wrote a total of

4    $42,000 in checks to Wilkinson.

5         On February 11, 2013, Agent Gee called Wilkinson. Cynthia Capron and

6    Bonnie Karow were also on the call. Wilkinson admitted that he met with Hammatt,

7    Artz, and Hodge in September 2012, but he denied signing the BBVA letter of credit.

8    Agent Gee confronted him with the $42,000, and Wilkinson said they were in

9    payment for heirloom jewelry to his father.

10        The next day, Wilkinson called Agent Gee to admit that he lied about the

11   $42,000. He admitted that Hammatt had written the checks to him so that he could

12   weather some personal financial difficulties. BBVA immediately placed him on

13   administrative leave, then terminated him on February 15, 2013 for personally taking

14   funds from a customer.

15        In mid-February, in spite of Hodge's skepticism of the authenticity of the jade

16   and after learning the BBVA letter of credit was fraudulent, Artz continued to push

17   for MCWE to sell the jade statue through Hammatt. Hodge reiterated his concerns,

18   but over Hodge's remonstrations and Agent Gee's warning to "get your head out of

19   the sand," MCWE agreed to work with Hammatt and Sorenson to reappraise the jade

20   statue. MCWE remained unwilling to permit the Secret Service to conduct an

21   independent appraisal. MCWE's appraiser, who was not permitted to personally

22   handle the jade, appraised it at around $20 million.

23        On March 11, 2013, the Secret Service arrived at MCWE with a search

24   warrant, seizing documents and the jade statue because they believed it to be

25   fraudulent. After the seizure, the Secret Service employed two appraisers, Steve

26   Little from the Los Angeles County Museum of Asian Art and William Chandler of

27   Chandler Art Consulting Services. Both agreed that, although the statue appeared to

28   be actual jade, it was definitely not from the third century B.C. At most, it was twenty

1    years old, made by modern implements, and thus it had little historical significance.

2    As a result, they valued it in the thousands, not millions, of dollars.

3    Although initially under suspicion for collusion with the fraud, the Secret

4    Service is no longer investigating MCWE in relation to this transaction.

## III.   ANALYSIS

6    When actions are brought under the Declaratory Judgment Act, but

7    jurisdiction is solely based on diversity, state law creates and determines the

8    substantive rights and duties that may be vindicated through declaratory relief.

9    *Compass Bank v. Petersen*, 886 F.Supp.2d 1186, 1196 (C.D. Cal. 2012). Because

10   the Court's subject-matter jurisdiction over this case arises in diversity, the Court

11   will apply California law to determine the parties' rights in this case.

12   When a declaratory relief action is brought to preempt a suit at law, courts

13   consider it an "inverted" lawsuit. Inverted suits typically do not include real claims

14   for damages or relief, and in effect are little more than forum selection. *See*

15   *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1137–38 (9th Cir. 2005). In

16   determining the rights of the parties, then, MCWE bears the burden of proof, and its

17   claims are those that were actually litigated at trial.

### A. MCWE's Claims Against BBVA

19   To the extent that MCWE's closing argument re-raises its motion to amend

20   the pleadings, that motion is **DENIED**. ECF 291. The added causes of action for

21   negligence, wrongful dishonor, and fraud were not actually litigated, and MCWE

22   did not prove any of the proposed causes of action at trial.

#### 1. Breach of Contract

24   MCWE's first claim against BBVA is for breach of contract. MCWE argues

25   that the BBVA letter of credit represents a contract between BBVA and MCWE that

26   BBVA breached when it did not pay on its terms.

27   Irrevocable standby letters of credit are agreements between an applicant and

28   a bank. The bank agrees to pay the sum contemplated on the letter in the event of the

applicant's default to a named beneficiary. Each letter is negotiated individually, the bank generally charges a fee, and the letter is backed by the applicant's personal funds or line of credit.

While a letter of credit is a contract between the applicant and the bank, there is no contract between any party and the beneficiary arising from the letter of credit. *SewChez Int'l Ltd. v. CIT Grp./Commercial Servs., Inc.*, 359 F. App'x 722, 724 (9th Cir. 2009) (California law) (finding no explicit or implied contract created by a letter of credit between beneficiary and issuer). In a typical circumstance of a properly-issued letter of credit, a beneficiary may have a cause of action for breach of contract as a third-party beneficiary. Here, however, BBVA and Hammatt made no actual contract. Hammatt was aware that Wilkinson was not an agent of BBVA when he and Wilkinson forged the document in Hammatt's office. Hammatt also knew he was facing bankruptcy and was not creditworthy for $5.2 million. As a result, no actual contract was formed between Hammatt and BBVA or between MCWE and BBVA. Accordingly, the Court **ENTERS JUDGMENT IN FAVOR OF BBVA** on MCWE's breach of contract claim against BBVA.

2. Promissory Estoppel

Next, MCWE sues BBVA for promissory estoppel. MCWE states that BBVA reasonably relied on BBVA's representations, through its agent Wilkinson, that it would issue and honor a $5.2 million letter of credit to guarantee a loan agreement between MCWE and Sorenson, and that its reliance led it to lose the $3.5 million transferred to Hammatt's trust account.

In pretrial motions, MCWE argued that Article 5 of the California Uniform Commercial Code ("UCC") prohibited BBVA from admitting evidence of the underlying loan transaction. This argument relied on the "independence principle," which is foundational to letter of credit law. However, for three reasons, evidence of the underlying transaction is relevant to this action.

First, under UCC § 5109, there is a fraud exception to the independence

principle. If the beneficiary has notice of forgery or material fraud in either the underlying transaction or the documents presented to an issuing bank, the court may look at the underlying transaction to determine whether the bank is obligated to honor a draw on the letter of credit.

Here, MCWE's officers believed the jade statue was fraudulently represented, yet they still proceeded with the transaction. Both Hodge and Artz, in their testimony, repeatedly discounted the value of the jade and would not have conducted the transaction without the BBVA letter of credit, despite the jade's value as collateral far exceeding the payback amount. Moreover, Hodge modified the contract from a loan to a "repurchase agreement," creating a purchase of the jade at $3.5 million and a sale at $5.2 million, both far exceeding its true value. Because of this, it was clear to MCWE before the onset of the transaction that it was fraudulent.

Additionally, MCWE was on notice that the BBVA letter of credit was forged when it presented the letter to BBVA. Mora and Agent Gee both told Artz about the likeliness that the letter was fraudulent, and Hammatt's statements that he was on the brink of bankruptcy directly contradicted the letter's representation that he was creditworthy for $5.2 million. Any reasonable person, presented with these facts, would know that the BBVA letter of credit was fraudulent.

Second, there is no actual letter of credit in this case. The forged document was never issued by BBVA, and as a result it is simply a fraudulent instrument. If BBVA had actually issued a letter of credit, it would have availed itself of the protections and liabilities established in Article 5. Here, this is not the case, and the Court therefore finds the circumstances of the letter's creation and the purported transaction it was intended to secure relevant to the inquiry into each party's complicity in the events.

Lastly, and most importantly, MCWE has brought the underlying loan transaction into question. MCWE has sued BBVA under a promissory estoppel theory. Promissory estoppel, unlike a wrongful dishonor action under Article 5, may

only be proved with evidence of MCWE's own conduct and the reasonableness of its detrimental reliance. Without such evidence, MCWE cannot state a promissory estoppel claim, and therefore the Court must examine the underlying transaction.

### a. The Claim's Merits

Promissory estoppel is an equitable doctrine that permits a court to enforce a promise if the promise is clear and unambiguous and the promisee reasonably and foreseeably relies on the promise to the promisee's detriment. MCWE argues that it relied on Wilkinson's promise that the BBVA letter of credit was valid and enforceable to lend Sorenson and Arrowmark $3.5 million. For various reasons, this reliance was unreasonable.

MCWE claims that in the repurchase agreement, Sorenson promised to "buy back" the jade statue for $5,121,000 after 120 days. MCWE further claims Wilkinson, acting on behalf of BBVA, promised that the BBVA letter of credit for $5.2 million was valid and that Hammatt had the funds in his BBVA account to cover the $5.2 million if Sorenson defaulted. In reliance on these promises, MCWE says it lent $3.5 million to Sorenson, and, as a result, when Sorenson failed to pay the $5,121,000, and the BBVA letter of credit proved to be fraudulent, it was damaged.

In the repurchase agreement, Sorenson promised that he would pay MCWE $5,121,000 on February 2, 2013. Wilkinson promised MCWE that the BBVA standby letter of credit for $5.2 million was valid. Both Sorenson and Wilkinson reasonably should have expected their promises would be relied on by MCWE. Wilkinson had actual authority as branch manager of BBVA to verify the letter of credit was valid.

However, whether or not MCWE did actually rely on these promises, the reliance was completely unreasonable:

1)   The loan was "too good to be true." It promised an almost 50% return in 120 days, representing a usurious APR of 215%. If the loan defaulted,

MCWE stood to collect over six times the principle between the letter of credit and the jade statue.

2) Hammatt and Sorenson's justification for unilaterally offering this outlandish and illegal rate of return hinged on their desperate need for capital in the summer of 2012 to purchase land before the mining concessions expired September 6, 2012. However, the loan was not consummated until October 2012, and at that time Hammatt guaranteed the contract with $5.2 million he allegedly held at BBVA. Even with this multi-million dollar account, Hammatt claimed to be on the brink of financial ruin. In the initial offering, Hammatt claimed he would make this "investment" personally if he had the capital, so why did he not use the trust funds to make the initial investment?

3) Sorenson and Arrowmark allegedly netted over $4 million a year from his mine, so it appeared from the financials provided to MCWE that he did not need a loan to purchase the property. Further, Hammatt represented that the jade statue would sell within sixty days of mid-July 2012. This in itself would have provided more than enough capital to purchase the property without involving outside parties.

4) Hammatt also insisted that confidentiality was of the utmost importance to this transaction and included an unsigned non-disclosure agreement ("NDA") in the initial offering. However, MCWE never executed an NDA.

5) MCWE was immediately suspicious of the offering's terms: Hammatt added the Century Bancorp letter of credit to the transaction when Cerullo expressed his skepticism about the jade statue, and that letter of credit was unsigned and appeared fraudulent. Then, when Hodge was brought into the discussions, he did not believe the jade appraisal and expressed grave reservations in his memo to Cerullo and Artz and recommended they nix the deal.

6)  If the Century Bancorp letter of credit was to be believed, Hammatt was the beneficiary of a €10 million letter of credit and therefore more than capable of personally funding the loan. His consistent pleas of poverty are at best inconsistent.

7)  Even after these first two denials (first by Cerullo and then by Hodge), Hammatt continued to press the deal and unilaterally increased the rate of return. Hammatt claimed he continued to "pull strings" to get the deal done, even though MCWE indicated it would not go through with the deal. He claimed Sorenson was anxious to do the deal immediately, but did not seek other lenders after either refusal and strung out negotiations far past the deadline.

8)  MCWE claims it refused to do the deal immediately because the Century Bancorp letter of credit was from a foreign bank (New Zealand); yet it accepted a letter of credit from BBVA, which was also a foreign bank (Spain).

9)  Wilkinson's silence when Hammatt asserted that he had over $5.2 million deposited at BBVA was belied by Hammatt's own statements that failure to get the $3.5 million from MCWE would be a "financial disaster" for him and his own repeated statements that he did not have the personal funds to loan the money himself.

10) Even though MCWE infrequently loaned money and had previous issues with its lending, it made its largest loan to date without any underwriting or verification: no MCWE officers ever met with Sorenson, researched Arrowmark or its creditworthiness, looked at the mining operation, researched Sorenson's creditworthiness or past bankruptcies, criminal convictions, or allegations of fraud. In the modern connected era, these inquiries would have been minimally burdensome. This blatant failure to investigate the loan heavily supports BBVA's theory MCWE did not

expect Sorenson or Arrowmark to repay the loan. MCWE made the loan expecting it to default, and it sought a windfall from cashing the letter of credit and pawning off the jade statue. The outrageous interest rate practically "guaranteed" Sorenson's default.

11) MCWE admitted to minimal previous personal or business dealings with Hammatt, but it relied solely on his representations that Sorenson had signed the contract, that Sorenson and Arrowmark even existed, that there was a mining operation, that there was a plot of land with a rich vein of gold, that the funds would be used to purchase this property, that Wilkinson was Hammatt's banker, that Hammatt had $5.2 million in a BBVA account, that Wilkinson was a disinterested and trustworthy party, and that the jade statue was worth $34 million. MCWE did not investigate Hammatt, including his creditworthiness, bankruptcies, criminal convictions, bar license, or bar disciplinary proceedings. Lastly, Hammatt's letter to Cerullo referring to Hammatt's help with past personal issues contradicts MCWE's claims of his limited previous involvement.

12) MCWE—through Artz—received repeated warnings from Castro, Mora, and eventually Agent Gee that the deal was fraudulent, but continued to rely on Hammatt's representations. This in itself is unreasonable. Artz's failure to communicate any of these concerns with Cerullo or Hodge was, even if the accusations were incredible, independently unreasonable in light of the significant risk to MCWE. At the point of Mora's warning, $3 million remained in Hammatt's trust account, and the damage to MCWE could have been mitigated.

MCWE raises an unclean hands defense, asserting that BBVA's misconduct mitigated MCWE's own misconduct. Unclean hands is a defense arising in equity, and it may only be asserted based on misconduct directly involved in the transaction at issue. Here, BBVA's actions regarding the transaction do not permit MCWE to

1    invoke unclean hands.

2         BBVA did not know of the BBVA letter of credit until January 2013, when

3    Agent Gee called and inquired about its validity. Even then, Agent Gee did not

4    provide BBVA a copy of the letter and did not inform BBVA that MCWE was the

5    purported beneficiary. Although he told BBVA that Wilkinson had allegedly signed

6    it, Karow conducted an internal investigation, and Wilkinson denied signing it. At

7    that point, without the actual letter, BBVA could do no more to investigate the letter

8    or the transaction. It was not until February 2013, when MCWE submitted it for

9    payment, that Wilkinson admitted to Gurley that he issued the letter.

10        BBVA also had no grounds to terminate Wilkinson until he admitted that he

11   was complicit in the letter of credit's issuance and had taken money from Hammatt.

12   When he did so, BBVA fired him.

13        Although BBVA knew of the Century Bancorp letter of credit, BBVA had no

14   evidence that MCWE or Wilkinson had any involvement. In fact, Hammatt was its

15   beneficiary. Without some knowledge that the Century Bancorp letter of credit

16   implicated either BBVA or its employees, BBVA had no duty to investigate further.

17   In sum, MCWE failed to demonstrate facts supporting an unclean hands defense

18   against BBVA.

19        Moreover, an unclean hands defense may also be vitiated by the asserting

20   party's own unclean hands. Here, MCWE knew the interest rate was usurious, knew

21   or strongly suspected that the collateral was fraudulently represented, designed the

22   transaction to avoid usury laws and tax consequences, ignored blatant discrepancies

23   in the deal's documentation, failed to relay numerous warnings from multiple parties

24   to Hodge and Cerullo, and relied unquestioningly on Hammatt's statements despite

25   their internal inconsistencies. These facts, taken together, show MCWE's unclean

26   hands in undertaking this loan.

27        If the underlying promise could have been reasonably relied upon,

28   Wilkinson's actual authority to confirm BBVA letters of credit would have

permitted MCWE to recover against BBVA. However, this deal was so preposterous and patently and obviously false that MCWE must have closed its eyes to avoid discovering the truth. Its negligence in this matter is tantamount to complicity in the fraudulent underlying transaction.

Because MCWE's reliance is unreasonable and BBVA committed no misconduct, the Court **ENTERS JUDGMENT IN FAVOR OF BBVA** on MCWE's promissory estoppel claim.

**B. MCWE's Claims Against Sorenson**

In MCWE's counterclaim, MCWE asserts claims against third-party defendant Larry Sorenson. Because Sorenson answered the SACC, his claims are not defaulted and MCWE bore the burden of proving them at trial.

First, MCWE alleges promissory estoppel against Sorenson. Because any reliance on promises made to MCWE related to the underlying loan transaction is unreasonable, the Court **ENTERS JUDGMENT IN FAVOR OF SORENSON** on MCWE's promissory estoppel claim.

Next, MCWE alleges Sorenson converted its money, seeking an amount to be proved at trial. At trial, Agent Gee's analysis showed that Sorenson received $998,000 out of the monies entrusted to Hammatt by MCWE. MCWE seeks punitive damages under California Civil Code § 3294, but because of its unclean hands the Court declines to award exemplary damages. *Estrada v. Speno & Cohen*, 244 F.3d 1050, 1053 (9th Cir. 2001), *as amended on denial of reh'g and reh'g en banc* (May 24, 2001) (unclean hands prohibits recovery of compensatory or punitive damages in California); *Cobalt Multifamily Investors I, LLC v. Arden*, 857 F. Supp. 2d 349, 363 n. 9 (S.D.N.Y. 2011) (courts may *sua sponte* assert unclean hands). Instead, these damages are intended to disgorge Sorenson of his unjust enrichment because he did not repay the principle disbursed to him on the loan.

As previously discussed, the loan agreement MCWE entered into featured an APR of 215%. Under California Constitution Article XV, § 1, interests rates

exceeding 10 percent per annum are usurious. The principle of a usurious transaction may sue to recover principle, but may not recover any interest whatsoever. *Rochester Capital Leasing Corp. v. K & L Litho Corp.*, 13 Cal.App.3d 697, 703 (1970). Accordingly, any prayer for prejudgment interest is **DENIED**.

Accordingly, the Court **ENTERS JUDGMENT IN FAVOR OF MCWE FOR $998,000** on the conversion claim.

Lastly, MCWE asserts two fraud claims against Sorenson. MCWE separately asserts that Sorenson defrauded it through false misrepresentations about the BBVA letter of credit and the jade statue. However, MCWE never spoke to Sorenson prior to funding the loan and therefore could not have relied on any statements, true or false, from Sorenson related to the letter of credit. Additionally, although Sorenson did sign the documents assigning the jade statue to MCWE and asserting its $34 million valuation, MCWE failed to prove that Sorenson knew that value was fraudulent. Further, MCWE's officers testified that they would not have conducted the deal with the jade statue as the only collateral because they did not believe its provenance. Clearly then, his misrepresentations, if he knew they were false, were immaterial to MCWE's decision to fund the loan. Accordingly, the Court **ENTERS JUDGMENT IN FAVOR OF SORENSON** on both fraud claims.

### C. Sorenson's Counterclaims

On November 12, 2013, Sorenson brought counterclaims against MCWE, Hammatt, and Wilkinson. However, Sorenson failed to appear at trial, failed to prosecute his claims, and failed to respond to trial subpoenas. Under Federal Rule of Civil Procedure 37(b)(2)(C), the Court **DISMISSES WITH PREJUDICE** Sorenson's claims for abandoning prosecution. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987); ECF 35-1.

### IV.   CONCLUSION AND JUDGMENT

For the foregoing reasons, the Court **ORDERS**:

1. Judgment be entered in favor of MCWE in the amount of $998,000 against

Larry Sorenson on MCWE's fourth count for conversion. This shall be the total amount to be paid on account of any liability claimed by MCWE in this action against Sorenson, including without limitation any and all claims for compensatory damages, statutory damages, interest, attorneys' fees, litigation expenses, and costs of suit.

2. Judgment be entered in favor of BBVA and against MCWE on MCWE's first count for breach of contract.

3. Judgment be entered in favor of BBVA and Sorenson and against MCWE on MCWE's third count for promissory estoppel.

4. Judgment be entered in favor of Larry Sorenson and against MCWE on MCWE's fifth count for fraud.

5. Judgment be entered in favor of Larry Sorenson and against MCWE for MCWE's sixth[3] count for fraud.

6. Judgment be entered in favor of BBVA and against MCWE on BBVA's declaratory relief action.

**IT IS SO ORDERED**.

Dated: August 25, 2015

Hon. Cynthia Bashant
United States District Judge

---

[3] MCWE's SACC numbers both fraud counts "Count V".